

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ISAIAH THOMAS NEW
Plaintiff,

v.

OFFICER WILLIAM C. MACY (Badge P3417), OFFICER JOSEPH R. HASSETT (Badge 962),
"RJ", JOAN DOE, TEMPLE BETH ZION, BUFFALO POLICE DEPARTMENT and THE CITY OF
BUFFALO,
Defendants.

**25  CV  578-S**

**COMPLAINT**
**JURY TRIAL DEMANDED**

Plaintiff alleges as follows:

INTRODUCTION

1.  This is a civil rights action brought pursuant to 42 U.S.C. §§ 1983 and 1985, the First,
    Fourth, and Fourteenth Amendments to the United States Constitution, and New York
    State law, seeking redress for the violation of Plaintiff's rights.

JURISDICTION AND VENUE

2.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and
    1343(a)(3) and (4), and supplemental jurisdiction over Plaintiff's state law claims
    pursuant to 28 U.S.C. § 1367(a).
3.  Venue is proper in this district under 28 U.S.C. § 1391(b) as the events giving rise to this
    claim occurred in Buffalo, New York.

PARTIES

4.  Plaintiff is an African American individual residing in Buffalo, New York.
5.  Defendant Temple Beth Zion is a religious organization located at 805 Delaware Avenue,
    Buffalo, NY 14209. It is home to the largest Jewish congregation in Western New York.
6.  Defendant Lieutenant William Macy (Badge P3417) is a police officer employed by the
    Buffalo Police Department. He is sued in his individual and official capacities.
7.  Defendant Officer Joseph Hassett (Badge 962) is a police officer employed by the
    Buffalo Police Department. He is sued in his individual and official capacities.
8.  Defendants RJ and Joan are white members of Temple Beth Zion who invited Plaintiff to
    the Friday evening Shabbat service on June 28, 2024 and Torah study the following
    Saturday morning.

9.  Defendant City of Buffalo is a municipal corporation organized under the laws of New York State.

FACTUAL ALLEGATIONS

10. On June 28, 2024, Plaintiff, an African American man, entered Temple Beth Zion at approximately 8:00 PM after being invited by Defendants RJ and Joan to attend a Shabbat service and Torah study. Plaintiff was the only person of color in attendance.

11. Temple Beth Zion livestreams its Shabbat services, which are recorded and available at http://player.cloud.wowza.com/hosted/txbfnbzk/player.html. The June 28, 2024 service was recorded and will show Plaintiff's peaceful attendance and the officers' actions.

12. Temple Beth Zion's mission statement, available at https://www.tbz.org/about-tbz/mission-and-core-values/, states that it "celebrates the rich diversity of our Jewish community" and "welcome[s] all who seek to join in Jewish spirit and congregation."

13. Plaintiff sat through the Shabbat service in the sanctuary with approximately 50 other congregants. The service included singing, music, and choral recitations in Hebrew.

14. After the service, Plaintiff waited in line to speak with the rabbi, as other congregants were doing. Defendant Lt. Macy followed Plaintiff and peered at him from the sanctuary entrance.

15. Defendant Officer Hassett approached Plaintiff and demanded identification. When Plaintiff asked for the officer's name, badge number, and reason, Officer Hassett refused to provide the information.

16. After Plaintiff provided identification, the officers told him to leave, claiming "threats against the Jewish people," that he was trespassing and threatening arrest. Defendant Lt. Macy then physically pulled Plaintiff's arm, twisted it behind his back and forcefully pushed Plaintiff from behind toward the sanctuary exit, despite Plaintiff's objections, causing Plaintiff to stumble toward the sanctuary floor and causing severe pain to Plaintiff's right shoulder and back that necessitated emergency medical treatment on June 29, 2024. Plaintiff was diagnosed with AC joint separation of the shoulder and provided pain relievers. Medical professionals provided Plaintiff with a shoulder immobilizer and a referral to an orthopaedic surgeon.

17. Outside the temple, Plaintiff asked Defendant RJ and BDP officers why he was removed after being invited. Plaintiff requested that RJ clarify the situation with the officers. This exchange is on video: the video is 2 minutes and 2 seconds in length.

18. Neither Defendant Lt. Macy nor Defendant Officer Hassett were wearing body cameras during the incident, in violation of the Buffalo Police Department's Body-Worn Camera Policy which requires all uniformed officers with significant public interaction to wear body cameras. The lack of body cameras likely emboldened the officers to violate Plaintiff's rights.

19. Defendant Lt. Macy lied about his name when Plaintiff asked him to identify himself, stating it was "Craig Macy." He also falsely claimed not to have a badge number. Defendant Hassett refused to provide his badge number or the spelling of his name.

20. Defendant Officer Hassett has an extensive history of misconduct, including:
    a) 21 complaints to Internal Affairs in 11 years, resulting in two suspensions and two

reprimands. *See* OpenOversight, Joseph R. Hassett,
https://openoversight.com/officers/84091.

b) Allegations of assault, filing false statements, and official misconduct. *Id.*

c) Being barred from testifying in criminal cases due to damaged credibility. *Id.*; *see also People v. Garrett*, 23 N.Y.3d 878, 886 (2014) (discussing the impact of police misconduct on credibility).

CAUSES OF ACTION

Count I: Violation of First Amendment Rights - Freedom of Religion
(Against All Defendants)

21. Plaintiff incorporates by reference all preceding paragraphs.
22. Defendants' actions in forcibly removing Plaintiff, the only African American congregant, from a religious service violated his First Amendment right to free exercise of religion. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (holding that the Free Exercise Clause protects against government hostility which is masked as well as overt); *Brandon v. Royce*, No. 20-1434 (2d Cir. 2024) (finding violation of free exercise rights when inmate was denied special religious meal).

Count II: Violation of Fourth Amendment Rights - Unreasonable Seizure
(Against Lt. Macy, Officer Hassett, and City of Buffalo)

23. Plaintiff incorporates by reference all preceding paragraphs.
24. Defendants' actions in physically seizing and removing Plaintiff without probable cause constituted an unreasonable seizure in violation of the Fourth Amendment. *See Terry v. Ohio*, 392 U.S. 1, 16 (1968) (establishing that brief investigatory stops constitute seizures under the Fourth Amendment); *Weaver v. Fay*, 12 F.4th 172 (2d Cir. 2021) (en banc) (discussing the contours of Fourth Amendment jurisprudence).

Count III: Excessive Force
(Against Lt. Macy, Officer Hassett, and City of Buffalo)

25. Plaintiff incorporates by reference all preceding paragraphs.
26. Defendants used excessive force in pulling Plaintiff's arm and pushing him toward the exit, causing severe pain and necessitating emergency medical care. This violated Plaintiff's Fourth Amendment rights. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) (establishing the objective reasonableness standard for excessive force claims); *Jones v. Treubig*, 963 F.3d 214, 225 (2d Cir. 2020) ("[I]t was well established at the time of the incident that the use of entirely gratuitous force is unreasonable and therefore excessive.").

Count IV: Monell Claim
(Against City of Buffalo)

27. Plaintiff incorporates by reference all preceding paragraphs.

28. The City of Buffalo's policies, practices, or customs were the moving force behind the constitutional violations alleged herein, including the failure to adequately train, supervise, and discipline officers to prevent misconduct and racial discrimination. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) (establishing municipal liability for constitutional violations resulting from official policy or custom).

29. Multiple lawsuits and complaints have alleged a culture of misconduct, abuse, and discrimination by Buffalo police, particularly against Black and Latino communities, demonstrating a pattern and practice of unconstitutional policing that likely emboldened Defendants Lt. Macy and Officer Hassett. *See, e.g.*, Hogues v. City of Buffalo (alleging false arrest and excessive force); *Calhoun v. City of Buffalo*, No. 1:20-cv-00362 (W.D.N.Y. filed Mar. 25, 2020) (alleging excessive force and failure to intervene); *Suttles v. City of Buffalo*, No. 1:21-cv-00799 (W.D.N.Y. filed July 9, 2021) (alleging unlawful stop, search, and use of force); *Kistner v. City of Buffalo*, No. 1:21-cv-00870 (W.D.N.Y. filed July 30, 2021) (alleging First Amendment retaliation and excessive force against peaceful protester); *Mack v. Howard*, No. 1:11-cv-00303 (W.D.N.Y. filed Apr. 6, 2011) (alleging excessive force and failure to intervene in chokehold incident); *Jones v. City of Buffalo*, 1:10-cv-00207 (W.D.N.Y. filed Feb. 24, 2010) (alleging false arrest and malicious prosecution); *Warr v. City of Buffalo,* No. 1:18-cv-00189 (W.D.N.Y. filed Feb. 12, 2018) (alleging unlawful arrest, excessive force, and denial of medical care); *Jennings v. City of Buffalo*, No. 1:09-cv-00715 (W.D.N.Y. filed Aug. 21, 2009) (alleging excessive force during arrest); *Hancock v. City of Buffalo*, No. 1:22-cv-00695 (W.D.N.Y. filed Aug. 31, 2022) (alleging excessive force during mental health crisis call); *Pate v. City of Buffalo*, No. 1:20-cv-00664 (W.D.N.Y. filed June 4, 2020) (alleging racially motivated traffic stop and unlawful search); *Black Love Resists in the Rust v. City of Buffalo*, No. 1:18-cv-00719 (W.D.N.Y. filed June 28, 2018) (challenging BPD's racially discriminatory traffic checkpoint and enforcement practices; motion for class certification filed May 29, 2024).

30. The New York Civil Liberties Union has also sued the Buffalo Police Department for withholding police misconduct records. *See* NYCLU v. Buffalo Police Department, No. 805097/2021 (N.Y. Sup. Ct. Erie Cty. filed Apr. 20, 2021). A 2017 report by the Partnership for the Public Good found that the Buffalo Police Department had the highest number of misconduct claims per officer among the state's 20 largest police departments. *See* Partnership for the Public Good, "Collaboration, Communication, and Community-Building: A New Model of Policing for 21st Century Buffalo" (2017), https://ppgbuffalo.org/files/documents/criminal-justice/policing/criminaljustice-_collaboration__communication__and_community-building.pdf. The report noted that "misconduct lawsuits against the police are a regular occurrence" in Buffalo.

31. In 2020, Reuters identified Buffalo as one of several U.S. cities with police forces that "have a history of civil rights violations and high rates of police misconduct." *See* Andrew Chung et al., "Shielded: How an Obscure Legal Doctrine Called Qualified Immunity Protects Police Accused of Excessive Force," Reuters (May 8, 2020), https://www.reuters.com/investigates/special-report/usa-police-immunity-variations/. The article cited data showing Buffalo police officers used force over 1,600 times between 2015 and 2019.

32. The financial consequences of the City of Buffalo's failure to address systemic police misconduct have been severe. From 2015 to 2020, Buffalo paid over $11.9 million in taxpayer funds to settle lawsuits alleging police misconduct, with most cases involving excessive force or negligent driving. *See Police misconduct costing Buffalo millions*, Investigative Post (July 20, 2020), https://www.investigativepost.org/2020/07/20/police-misconduct-costing-buffalo-millions/. These settlement costs have strained the city's budget and diverted resources away from essential community services. *Id.* In fiscal year 2024-2025, the City of Buffalo, the second most populous city in the State of New York, allocated only $401,000 for youth programming, $118,000 for recreational programming, and $202,000 for workforce development and training, while spending millions on police misconduct settlements. *See* City of Buffalo 2024-2025 Adopted Budget, http://www.buffalony.gov/1702/2024-2025-Adopted-Budget. This disparity underscores the economic toll of unchecked police abuse on Buffalo's most vulnerable communities. *Cf. Stinson v. City of New York*, 282 F.R.D. 360, 383 (S.D.N.Y. 2012) (certifying class action challenging the NYPD's unconstitutional summons practices and noting the public interest in reforming those practices).

33. Despite the clear financial and human costs of unchecked police misconduct, the City of Buffalo has failed to implement meaningful reforms or adequately hold officers accountable, demonstrating deliberate indifference to the constitutional rights of its residents, particularly people of color. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) (establishing municipal liability for constitutional violations resulting from official policy or custom of inaction in the face of widespread abuses). This pattern of unconstitutional policing and the attendant fiscal burden on taxpayers further underscores the need for court intervention to compel systemic change. *See Floyd v. City of New York*, 959 F. Supp. 2d 540, 557 (S.D.N.Y. 2013) (finding that court-ordered injunctive relief was necessary to address the NYPD's widespread Fourth and Fourteenth Amendment violations). Allowing these abuses to continue unchecked will only further erode public trust, undermine effective law enforcement, and continue to drain the City's coffers at expense of taxpayer protection and services. *Cf. United States v. City of Ferguson*, 4:16-cv-180, 2016 WL 4211543, at *1 (E.D. Mo. Aug. 9, 2016) (discussing how unconstitutional policing practices "undermine law enforcement legitimacy and make policing less effective, less safe, and less just").

34. The City of Buffalo's failure to adequately discipline officers for misconduct further demonstrates its deliberate indifference to constitutional violations. Despite court rulings and the city charter clearly giving the police commissioner disciplinary authority, both the commissioner and mayor have claimed that the union contract and arbitration process prevent them from effectively disciplining officers. *See* Policing Buffalo's Police, Investigative Post (Jan. 29, 2024), https://www.investigativepost.org/2024/01/29/policing-buffalos-police/. This abdication of responsibility has fostered an environment where officers like Defendants Macy and Hassett feel emboldened to violate citizens' rights with impunity. *See Beck v. City of Pittsburgh*, 89 F.3d 966, 974 (3d Cir. 1996) (finding that a police department's failure to act in the face of repeated complaints of officer misconduct creates a custom of

tolerating rights violations). The systemic failure to discipline officers is part of the broader unconstitutional policing culture that was the moving force behind the violations of Plaintiff's rights. *See Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) ("To prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious."). This pattern of inaction in the face of widespread abuses justifies comprehensive injunctive relief as requested in the prayer for relief, including, inter alia, court-ordered reforms to the disciplinary process. *See United States v. City of Los Angeles*, No. 00-11769 GAF, 2001 WL 314976 (C.D. Cal. Feb. 16, 2001) (consent decree requiring implementation of new disciplinary system and independent oversight); *United States v. City of Pittsburgh*, No. 2:97-cv-00354-RJC (W.D. Pa. Apr. 16, 1997) (consent decree overhauling disciplinary system, implementing early warning system to identify problem officers, and requiring quarterly discipline audits by independent auditor); *United States v. City of Cleveland*, No. 1:15-cv-01046 (N.D. Ohio June 12, 2015) (consent decree requiring establishment of civilian oversight board to review disciplinary process and recommend improvements).

35. The city's officials will not act. Intervention by this court, as requested in the prayer for relief, to reduce and prevent further constitutional violations by the Buffalo Police Department is in the interest of protecting citizens' rights and promoting judicial economy. *See Floyd v. City of New York*, 959 F. Supp. 2d 540, 557 (S.D.N.Y. 2013) (noting that court intervention was necessary where the NYPD's stop-and-frisk practices violated the Fourth and Fourteenth Amendments on a widespread basis); *United States v. City of New Orleans*, 947 F. Supp. 2d 601, 611 (E.D. La. 2013) (approving consent decree with extensive court-ordered reforms to address the New Orleans Police Department's "pattern of unconstitutional conduct"). The citizens of Buffalo have a strong interest in ensuring their tax dollars are used to fund a police force that respects constitutional rights, rather than violating them with impunity. *Cf. Stinson v. City of New York*, 282 F.R.D. 360, 383 (S.D.N.Y. 2012) (certifying class action challenging the NYPD's unconstitutional summons practices and noting the public interest in reforming those practices). Allowing these abuses to continue unchecked not only harms the victims, but erodes public trust and confidence in law enforcement, making it harder for police to effectively serve the community. *See United States v. City of Ferguson*, 4:16-cv-180, 2016 WL 4211543, at *1 (E.D. Mo. Aug. 9, 2016) (discussing how unconstitutional policing practices "undermine law enforcement legitimacy and make policing less effective, less safe, and less just").

36. Intervention by this Court, as requested in the prayer for relief, is not only in the interest of protecting constitutional rights and promoting judicial economy but is a moral imperative to prevent further abuse of the very citizens who fund the Buffalo Police Department through their tax dollars. Taxpayers of Buffalo are being harmed by the uniformed officers whose salaries, vehicles, equipment, benefits, and pensions they pay for, an intolerable perversion of the social contract between a city and its people. *See Marbury v. Madison*, 5 U.S. 137, 163 (1803) ("The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury."); *Mapp v. Ohio*, 367 U.S. 643, 660 (1961) (noting the importance of judicial integrity in addressing unlawful police conduct).

Count V: Conspiracy to Violate Civil Rights
(Against All Defendants)

37. Plaintiff incorporates by reference all preceding paragraphs.
38. Defendants conspired to deprive Plaintiff of his constitutional rights in violation of 42 U.S.C. § 1985(3). *See Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015) (outlining elements of a § 1985(3) claim).

Count VI: Assault and Battery
(Against Lt. Macy and Officer Hassett)

39. Plaintiff incorporates by reference all preceding paragraphs.
40. Defendants' actions constitute assault and battery under New York law. *See Charkhy v. Altman*, 252 A.D.2d 413, 414 (N.Y. App. Div. 1998) (defining elements of assault and battery).

Count VII: False Arrest
(Against Lt. Macy and Officer Hassett)

41. Plaintiff incorporates by reference all preceding paragraphs.
42. Defendants arrested Plaintiff without probable cause, constituting false arrest under New York law. *See Broughton v. State*, 37 N.Y.2d 451, 456 (1975) (outlining elements of false arrest claim).

Count VIII: Intentional Infliction of Emotional Distress
(Against All Defendants)

43. Plaintiff incorporates by reference all preceding paragraphs.
44. Defendants' actions were extreme and outrageous, causing Plaintiff severe emotional distress. *See Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (1993) (outlining elements of intentional infliction of emotional distress).

PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

a) Enter judgment in favor of Plaintiff and against Defendants;
b) Award compensatory damages in an amount to be determined at trial;
c) Award punitive damages against the individual Defendants;
d) Grant injunctive relief and enter a consent decree to prevent further constitutional violations and effectuate reform within the Buffalo Police Department, including:
    i. Appointing an independent monitor, overseen by the Court, to assess BPD's progress in implementing reforms;
    ii. Ordering BPD to develop improved policies, training, and practices on use of force, de-escalation, racial profiling, responding to individuals in crisis, stops and searches, internal investigations, and community policing;

iii.    Requiring all on-duty BPD officers to use body-worn cameras and adopt stringent protocols for their use;

iv.    Mandating collection and public reporting of comprehensive data on police activities, including use of force, stops, searches, arrests, and demographics;

v.    Establishing an independent community oversight board with investigative and subpoena powers to review complaints of police misconduct and recommend discipline;

vi.    Requiring BPD to adopt an Early Intervention System to identify and proactively address problematic officer behavior patterns before they escalate;

vii.    Order the City of Buffalo to allocate sufficient ongoing funding and personnel to support the implementation of these reforms;

viii.    Mandate new officer hiring standards to ensure high-quality recruits, as well as comprehensive misconduct background checks for lateral hires and promotions;

ix.    Require quarterly, comprehensive, independent compliance audits and public reporting to the Court on the status of reforms;

x.    Establish a clear timeline with intermediary benchmarks that the BPD must meet to reach full and effective compliance and terminate the consent decree;

e) Award attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

f) Grant such other relief as the Court deems just and proper.

Dated: June 25, 2025

Respectfully submitted,

/S/ ISAIAH THOMAS NEW
PO BOX 209
BUFFALO, NY 14215

Welcome to Temple Beth Zion, Buffalo New York's largest reform Jewish congregation

7/10/24, 5:07 PM

Enriching Jewish lives, promoting Jewish values, strengthening Jewish bonds and fostering lifelong learning



CONTACT    Search

About TBZ    Worship    Events    Education    Community    Calendar    Membership    Giving

Shabbat Services

# Mission and Core Values

### Temple Beth Zion Planning Statements

*Adopted by the congregation on June 8, 2012*

### OUR MISSION STATEMENT

Temple Beth Zion is a Reform congregation that enriches Jewish lives, promotes Jewish values, strengthens Jewish bonds and fosters lifelong learning. Our congregation celebrates the rich diversity of our Jewish community, preserves sacred traditions while encouraging innovation, and affirms our Judaism through words and deeds.

### OUR SHARED FUTURE

Our spiritual and cultural ties to Judaism will strengthen us as individuals, as a community and as a people. We will be as welcoming in our congregation as we are in our homes and will honor our sacred covenant with God in caring for both our members and the greater community.

### OUR CORE VALUES

Within our Temple Beth Zion community:

- We welcome all who seek to join in Jewish spirit and congregation as they experience and share the changing stages of life.

- We experience inwardness and transcendence flowing from teaching and learning, song and silence, and prayer and action.

- We are called upon to perform Mitzvot and fulfill our role in Tikkun Olam - healing the world by learning mindfulness, caring, ethical judgment, and the meaning of being Jewish through Torah.

- We foster, through support of Israel as the Jewish homeland, an ever-deepening affiliation with Jews across the boundaries of territory, time and tradition.

- We involve ourselves in ensuring that our communities and neighborhoods thrive.

- We welcome and nurture diversity of thought and action.

- We each travel a unique spiritual path, with our own understanding of God, spirituality and the sacred as expressed in personal practice.

Mission and Core Values

History

Leadership & Staff

Careers at TBZ

TBZ Places & Spaces

Cofeld Judaic Museum at Temple Beth Zion

Blum Jewish Education Project

Resources

Holocaust Memorial Scroll

©2015 Temple Beth Zion

By-Laws and Policies

Privacy Policy

Site Map

Log In

**Aaron and Bertha Broder Center for Jewish Education**
700 Sweet Home Road, Buffalo, New York 14226 (map)
**(716) 836-6565** - fax (716) 831-1126

**Sanctuary, Chapel and Cofeld Judaic Museum**
805 Delaware Avenue, Buffalo, New York 14209 (map)



https://www.tbz.org/about-tbz/mission-and-core-values/

OpenOversight   Browse   Find an Officer   Submit Images   Volunteer   About                    Register   Log In

OpenOversight Dashboard / Joseph R. Hassett

## Officer Detail: Joseph R. Hassett



### General Information

| | |
|---|---|
| Name | Joseph R. Hassett |
| OpenOversight ID | 48191 |
| Department | [NY] Buffalo Police Department |
| Race | White |
| Gender | Male |
| Birth Year (Age) | Data Missing |
| First Employment Date | 2003-07-15 |
| Number of Known Incidents | 4 |
| Currently on the force | Yes |

### Assignment History

| Job Title | Badge No. | Unit | Start Date | End Date |
|---|---|---|---|---|
| Police Officer | P2059 | | Unknown | |

### Salary

| Annual Salary | Overtime | Total Pay | Year |
|---|---|---|---|
| $107,560.05 | | | FY2020 |

### Incidents

#### Incident 231

| | |
|---|---|
| Date | Sep 1/9, 2014 |
| Department | Buffalo Police Department |
| Officers | Joseph R. Hassett, Louis E. etc. |
| Description | In September 2014, Hassett and his partner, John Boyer, apprehended 30-year-old Kevin Worthy at a gas station at the corner of South Park Avenue and Louisiana Street. The officers then took Worthy and his car into the nearby Commodore Perry housing projects, according to sources who had witnessed the incident prior to that follows. |
| | The officers charged Worthy with trespassing on public housing property, according to the incident report. They also charged Worthy with blocking his car — which had been at a gas pump before they arrested him and moved it — another before they arrested him and moved it — another before and blocking a roadway. |

#### Outcome

All the charges against Worthy eventually were dropped.

The Internal Affairs investigation into the incident took four years to resolve. The finding: The complaint was "not sustained." Neither officer was punished.

| | |
|---|---|
| Address | Buffalo, NY |

#### Incident 230

| | |
|---|---|
| Date | Sep 01, 2012 |
| Department | Buffalo Police Department |
| Officers | Joseph R. Hassett |
| Description | Officer Joseph Hassett maliciously and intentionally assaulted Adam Harrison without provocation during a September 2012 arrest near 1625 Clinton St. |
| | Harrison said he was punched and severely injured from the repeated blows and also suffered a shock to his nervous and anxious system and may have permanent defects. |

#### Outcome

A civil case against the City of Buffalo was settled for $70,000. There has been no information publicly released about disciplinary action against officer Hassett.

| | |
|---|---|
| Address | Clinton Street<br>Buffalo, NY |

#### Incident 234

| | |
|---|---|
| Date | Nov 21, 2013 |
| Department | Buffalo Police Department |
| Officers | Joseph R. Hassett, Colin M. Breen |
| Description | Police officers Corey Krug and Joseph Hassett assaulted and detained Mickey Spencer for a violation of NYS V&T Law 1238 Lamps and Other Equipment on Bicycles in that he did not have a light or reflector on his bicycle. Spencer required surgery on his arm due to the assault. |

| | |
|---|---|
| Address | E. Ferry Street<br>Buffalo, NY |

#### Incident 41

| | |
|---|---|
| Date | Mar 16, 2017 |
| Department | Buffalo Police Department |
| Officers | Joseph R. Hassett |
| Description | Buffalo Police officer Joseph Hassett was recorded on camera assaulting Timothy Stanton Jr. on March 16, 2017. Stanton was taken to ECMC for a head injury and a cut on his forehead that required stitches. The Erie County District Attorney's Office and the Buffalo Police Department both said they didn't learn about the incident until a day of the confrontation was requested by Stanton's attorney. Hassett was charged with two counts of third-degree assault, official misconduct, offering a false instrument for filing and making a punishable false written statement in connection to an incident that happened in March 2017. |
| | Prosecutors argued the use excessive use of force, but the Judge disagreed, dismissing all criminal charges. BPD Internal Affairs opened an investigation on May 18, 2017 and officially suspended Officer Hassett on May 30, 2017, according to Commissioner Daniel Derenda. Hassett was suspended for 30 days without pay. |

| | |
|---|---|
| Address | Buffalo, NY |

### Links

**Buffalo Emergency Response Team Member**
Roster from Buffalo's Emergency Response Team from IC2012

**Prosecutors should use disciplinary rules, not win at all costs**
"The Erie County District Attorney's Office, after a comprehensive review of Internal Affairs files and Internal Grand Jury minutes relating to the conduct of the subject Officer, has found that the subject Officer's credibility is irremediable and therefore there is no longer be called upon as a witness in any pending or future criminal action." – Investigative Post / Geoff Kelly

**Jurisdictional rules of the Police should be**
In a four-year period between 2014 and 2017 Internal Affairs looked into 55 complaints against Hassett citing excessive use of force. Of those, the Stanton incident, ended in findings of "not sustained." – Investigative Post / Geoff Kelly

**One more civilian Buffalo cop's job**
Disciplinary Cards as of July 2020 – Investigative Post / Geoff Kelly

**Film at best, the punched out**
The city built a dossier of Buffalo police officer but it was rebuffed by an arbitrator because only back on the streets, but the district attorney has mused that could end says the detective knows cops doing the count – Bruce Pushkin / Investigative Post

**OpenOversight**
A project of the Lucy Parsons Labs. All source is
Licensed under the GNU GPL.
Source available on GitHub

**Contact**
[facebook] [instagram] [twitter] [email]
Privacy Policy

**Navigation**
Submit Images
Find an Officer
Volunteer
About









Police misconduct costing Buffalo millions – Investigative Post : Investigative Post     7/10/24, 5:08 PM

  

Latest News     About Us     Our Impact

Nonprofit, nonpartisan, fact-based news      DONATE >      NEWSLETTER >     



# Police misconduct costing Buffalo millions

Taxpayers have paid $11.9 million since 2015 to settle lawsuits, mostly involving officer misconduct or reckless driving.

By Phil Gambini

**Share on**  



A cop shooting and paralyzing a teenage driver.

A police tow truck driver running a red light and slamming into a passenger car.

A cell block attendant ramming a handcuffed detainee's face into a door at Central Booking.

The incidents all led to lawsuits against the City of Buffalo and its police department, and subsequently settlement agreements. Since 2015, a total of 16 settlements have cost taxpayers $11.9 million. Most involve excessive use of force or negligent driving.

Those figures trouble Samuel Davis, a local defense attorney.

"I find it alarming that that much money has been paid out," he said.

Davis called the settlements the "tip of the iceberg" when it comes to problematic interactions with the police. Indeed, only about 1.1 percent of people who believe they have experienced misconduct decide to sue, according to a survey conducted by the U.S. Department of Justice.

Capt. Jeff Rinaldo, the police spokesman, said the data compiled by Investigative Post suggests the force is doing a "very good job" considering the department responds to 250,000 to 300,000 calls per year.

The city is defending three additional cases brought by the relatives of men of color who died in encounters with police, two of them shot as they fled. A fourth suit relates to an officer who drowned during a training exercise.

The court orders and settlements have fiscal implications for a city struggling to close budget deficits, as well. Buffalo has spent $5.3 million on settlements in the past year-and-a-half alone.

The settlements don't cost cops or the police department money; they are paid for out of the city budget's general fund. Nor do officers or their union pay for the vast majority of legal costs defending lawsuits; the city picks up the tab.

University Common Council Member Rasheed Wyatt said the mounting settlement costs should concern city lawmakers. The city's financial situation is such that another multi-million dollar settlement "would probably devastate us," Wyatt said.

## Taxpayers cover cost of settlements

Investigative Post reviewed city and court records, as well as press accounts, to determine how much the city has paid to satisfy claims of misconduct against officers and other department employees. The calculation does not include money spent on attorneys to defend the cases.

Rinaldo, the police spokesman, said he could not comment on specific cases or pending litigation, but views the settlement total is not an indictment of the state of policing in Buffalo.

"It says for the most part the Buffalo Police Department is doing a very good job," he told Investigative Post.

"What people have to recognize is, over the course of the five-year span that you looked at, there's probably well over two million interactions between the police and the public that occur in that time span."

Get our newsletters delivered to your inbox

*indicates required

Email Address *

[                                                          ]

Full Name

[                                                          ]

Newsletters *

☐ WeeklyPost (delivered Sundays)
☐ PoliticalPost (delivered Wednesdays)

SUBSCRIBE

John Evans, president of the Police Benevolent Association, was reluctant to speak at length on the settlements. He said it was the purview of the Corporation Counsel's office.

"We have nothing to do with that," he said of the settlements. "It's the city that does that. If they chose to allocate that money, those funds, that's their business."

Buffalo does not carry insurance to cover settlement claims. It's self-insured, so payments are made out of general operating funds. That's taken a chunk out of city finances of late. City savings are dwindling after being used to keep down property taxes for years and covering miscalculations that overestimated other revenues. As a result, the city was facing a deficit estimated at $16 million to $30 million for the fiscal year that ended June 30.

Part of that was driven by the $4.5 million settlement paid in February to Wilson Morales, who was shot and paralyzed by police officers in 2012.

Miles Gresham, a member of the local activist group pushing for police reforms, Free the People Western New York

pointed to the Morales's payout and contrasted the sum with what's budgeted to provide services to city youth and job seekers, including:

- $401,000 for youth programming.
- $118,000 for recreational programming.
- $202,000 for workforce development and training.

The costs of settlement would swallow those budgets and impact "people who had nothing to do with the fault found with the city or with its police officers," Gresham said.

"This is costing real services," he said.

Wyatt, the Council member, said it's one thing to litigate claims that result from police performing their duties; it's another thing entirely when cops flout policy or the law. The Morales case is an example of the city being on the hook for an officer who acted outside the scope of his duties, he said.

"This person shot into a moving van," he said. "That's against police policy. That shouldn't have happened."

However, Wyatt and Niagara Common Council Member David Rivera, chairman of the Council's Police Oversight Committee, were hesitant to draw conclusions on the state of policing in Buffalo based solely on the total settlement amounts.

"It's a difficult question to answer," Rivera said. "Every case is individual."

It's difficult to compare the cost of settlements in Buffalo with other cities. But when Buffalo data is contrasted with a 2016 study done by a University of California professor Joanna Schwartz, it suggests by one metric City Hall is

paying more than some other large cities to settle police lawsuits.

## Cost of settlements and court order damages, per officer

| City | Payments per officer |
|---|---|
| New York City | $4,694 |
| Chicago | $3,958 |
| Buffalo | $3,353 |
| Los Angeles | $3,064 |
| Philadelphia | $2,242 |
| Cleveland | $1,668 |
| Indianapolis | $1,503 |
| Atlanta | $1,113 |
| Phoenix | $976 |
| Dallas | $811 |
| Tucson | $379 |
| Miami-Dade County | $296 |
| Raleigh | $145 |

*Note: Data drawn from study published in UCLA Law Review that considered settlements from 2012-14. Study did not include Buffalo. Buffalo data based on settlements from 2015 to 2020.*

The New York City Police Department, the nation's largest, paid out the most, according to the study. Chicago was next and Buffalo third, ahead of such big-city departments as Los Angeles and Philadelphia.

It's not a direct comparison. The 2016 study covered the

years 2012-14. Investigative Post reviewed payments from the last five years.

Schwartz cautioned against using the settlement totals as a strict measure of police conduct. State law and local judicial systems in respective cities all play a role, she said.

## Crashes, excessive use of force claims

Six of the 16 settlements and court orders in Buffalo involved allegations of excessive use of force, at a cost of $5.9 million. A half-dozen others involved crashes involving police vehicles, costing $4.5 million. The remaining four involved claims of wrongful arrest, imprisonment or death. Three settlements exceeded $1 million.

Morales's settlement was approved in February. It stemmed from an incident in 2012 when Morales, then a 17-year-old student, was shot and paralyzed by a police officer.

The officers involved, Jason Whitenight and Karl Schultz, said they pursued Morales for driving erratically at high speed. Though the officers had a prisoner in the backseat of their unmarked vehicle, they chose to divert their route and chase Morales.

Morales, who said he did not realize the unmarked car pursuing him was a police vehicle, sped away from what he thought was an aggressive driver. The chase ended when Morales lost control of his minivan, hopped a curb and came to a stop. Whitenight and Schultz pulled up behind. They exited the vehicle. As they did, Morales pulled his minivan backward. The officers began shooting and struck Morales, according to court records.

The next largest settlements were paid to twins, Brigette and

Kristen Brzezniak. The sisters, then 24, were struck by a
police tow truck in 2013. Both suffered severe back injuries
that required numerous surgeries to correct. Brigette
received $2.25 million and Kristen $1 million from the city
in 2017.

In another settlement of note, Garry Connors brought a
lawsuit against the police department and City Hall for his
late son, Matthew. Matthew Connors was shot and killed
during an encounter with Officer James Reese in 2009.
Reese said Connors was suspected of a robbery and had
tracked him to his apartment.

## Police settlements paid by Buffalo, 2015 to 2020

| Year | Name | Amount | Type |
| --- | --- | --- | --- |
| 2020 | Wilson Morales, Jr. | $4,500,000 | Excessive force |
| 2019 | Shaun Porter | $300,000 | Excessive Force |
| 2019 | Jerome Thagard | $250,000 | Wrongful imprisonment |
| 2019 | Estate of Ida Murphy | $125,000 | Wrongful Death |
| 2019 | Ricky Spencer | $115,000 | Excessive Force |
| 2019 | Thomas Elston | $25,000 | Excessive force |
| 2018 | Jessica Perkins | $180,000 | Vehicular crash |
| 2018 | Diane Peach | $175,000.00 | Vehicular crash |
| 2017 | Brigette Brzezniak | $2,250,000 | Vehicular crash |
| 2017 | Kristen Brzezniak | $1,000,000 | Vehicular crash |
| 2017 | Rachel Redgos | $750,000 | Vehicular crash |
| 2017 | Estate of Matthew Connors | $600,000 | Excessive force |
| 2016 | Justin Levy | $290,000 | Wrongful Imprisonment |
| 2016 | Timothy Monahan | $225,000 | Vehicular crash |
| 2015 | Lynn Dejac-Peters | $735,000 | Wrongful Imprisonment |

| 2015 | Laura Spear | $350,000 | Excessive force |

*Source: Investigative Post research.*

An altercation took place at the residence. Reese said Connors brandished a handgun and a fight ensued. The family contended Connors had back injuries that would have prevented him from fighting in the way Reese described. The weapon turned out to be a pellet gun. The family received a $600,000 settlement.

Another costly settlement involved a $300,000 payment to Shaun Porter. He was standing handcuffed with his back to multiple officers inside a room in Central Booking in 2016 when  cellblock attendant Matthew Jaskula grabbed him by the shoulders, threw him face first into a metal door and dragged him down a hallway by his wrists.

## City defending other lawsuits

Four high-profile lawsuits concerning allegations of city police misconduct are pending. Another likely plaintiff, Quentin Suttles, has signaled his intent to sue over police misconduct allegations with a notice of claim filed in June. All but one of the lawsuits involve men of color.

Wardel "Meech" Davis, 20, was stopped by police in February 2017 by Officers Nicholas Parisi and Todd McAlister. Police said Davis fled and resisted arrest, so he was chased, detained and punched. A medical examiner retained by the state Attorney General's Office said he died of an asthma attack triggered by the encounter.

The state Attorney General's Office concluded the officers were not responsible for Davis's death. They noted, however, that the officers involved refused to cooperate with the

investigators' requests for interviews. The report faulted the department for not outfitting its officers body cameras or squad cars with dash cameras. It also took issue with protocols of the Erie County Medical Examiner's Office.

The Davis family's lawsuit is ongoing. The family's attorney, Robert Perk, declined to comment.

Two months later in 2017, Jose Hernandez-Rossy, 26, was shot by Officer Justin Tedesco while fleeing police after a traffic stop. Tedesco and the other officer on scene, Joseph Acquino, "mistakenly" believed Hernandez-Rossy to have a gun, according to the AG's report. State investigators concluded his death was the result of "a calamitous confluence of events." No charges were filed. The lawsuit is ongoing, according to attorney Nelson Torre.

The most recent death was that of Rafeael "Pito" Rivera, 32, who was shot and killed by Officer Elnur Karadzhaev on the city's West Side in 2018. Surveillance video captured a portion of the events. The video shows Rivera running away from officers, who shot him three times. Police claim Rivera was armed, so the AG's office did not investigate his death.

The family of a deceased officer is also suing the department and city. Craig Lehner, a 35-year-old officer, drowned in 2017 during a training exercise in the Niagara River's fast-moving water. The lawsuit alleges the department "violated and departed from" the rules and regulations that guide police in dive training.

In court papers, the city has disputed allegations in all four cases.

## Challenges faced by plaintiffs

Preparing and litigating cases comes with challenges, multiple attorneys told Investigative Post. Protracted cases in civil court will cost the plaintiff in money and the attorney in time. The Morales case, for instance, took eight years to conclude from the time of the incident to the settlement.

Davis, the defense attorney, said amassing the evidence to pursue a lawsuit against police and fighting for a plaintiff in court is no easy feat.

"Lawyers fight tooth and nail when you file something of that nature," he said.

Steve Cohen, the Rivera family's attorney, said civilians must face off in court against the budgetary resources of the city. Plaintiffs are also hampered by what Cohen described as good officers' reluctance to speak out about the transgressions of their colleagues. Colloquially, it's called the "blue wall of silence."

"There's an entire machine designed to defeat these claims," Cohen said.

Until the law was repealed in June, a police officer's disciplinary history, known technically as "50-a material," was not regularly admissible in court. Plaintiffs had to convince a judge to make the records available and police departments usually fought disclosure. The majority of the time judges ruled that the records are not relevant to the case at hand, Cohen said.

"Forget about allowing it to be seen by a jury — that comes later," Cohen said.

Davis said there are complications for individuals who sustain injuries during arrest and are subsequently charged

with a crime. A common mantra attorneys repeat to clients is: if you want to pursue a civil case you cannot take a plea for criminal charges, he said.

For a person whose jury trial carries the risk of lengthy incarceration, forgoing a plea deal is a big risk.

"To take any sort of plea, that's an admission of guilt," Davis said. "It's a sort of, 'You asked for it' scenario, many times."

One of the unique protections afforded to police in civil court, and one of the reasons they rarely pay as individuals, is a judicial doctrine known as "qualified immunity." The doctrine is intended to shield government officials from legal harassment while performing their duties.

In a recent contribution to the Washington Post, Schwartz, the UCLA professor, described the doctrine as a shield for government officials that protects against "liability for damages, even if they have violated the constitution."

The immunity is withheld only if the official violated "clearly established law," according to Schwartz. That occurs "only when a prior court has held that an officer violated the Constitution under virtually identical circumstances," she wrote.

## Merits of reforms are debated

Schwartz said ending qualified immunity an important first step in decreasing legal costs for plaintiffs and defendants and increasing police accountability. It's one of the few steps that could have immediate impact nationwide if taken, she said.

"I don't think that it's a cure all," she said, "(but) it would

have some important effects."

Evans, the PBA president, disagreed.

"If those components were to end I'd have to say you'd have to be a moron to take this job," he said. "Because on the next call you went on, you could lose everything you have sacrificed and worked for in an instant. Attorney fees alone could destroy you financially. Forget about an adverse civil court decision."

Gresham, the defense attorney and activist, supports doing away with the doctrine. He said he understands protecting police, like most city workers, from being pursued for minor property damage or similar tort claims.

"But when we talk about killing people, maiming people, scarring people and their families for life — no, I don't think cops should be protected from that," he said. "Cops that can't be trusted to do their job without doing those kinds of things on a regular basis, they should absolutely quit."

Wyatt said police reform discussion requires being open to diverse proposals. The union's voice should be part of that, he said.

"At the end of the day, we want good police. We want officers to follow policy," he said. "We cannot continue to payout the millions of dollars we've been paying."

*posted 4 years ago - July 20, 2020*

---

## Related stories

- Buffalo's precarious budget
- Who's responsible for bad cops?
- Policing Buffalo's police

- Spending more on settlements than services
- License plate readers target minority neighborhoods

## About Us

Journalism awards
Commenting Policy
Financial Transparency Policy
Privacy Policy
Major donors

## Free weekly newsletters

Delivered to your inbox every Sunday morning.
Email Address

SIGN UP

Investigative Post
487 Main Street • Suite 300
Buffalo, NY 14203
Phone: 716-831-2626
info@investigativepost.org

Copyright © 2024 Investigative Post Inc.











